UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Leda Mox and Armstrong Equine Massage Therapy, LLC,

                    Plaintiffs,

v.

Dennis Olson, Jr., *in his official capacity as Commissioner of the Minnesota Office of Higher Education*,

                    Defendant.

File No. 23-cv-3543 (ECT/EMB)

**OPINION AND ORDER**

---

Bobbi M. Taylor and Jeffrey H. Redfern, Institute for Justice, Arlington, VA, and Anthony B. Sanders, Institute for Justice, Lake Elmo, MN, for Plaintiffs Leda Mox and Armstrong Equine Massage Therapy, LLC.

Alexander Robertson Sloan and Martha J. Casserly, Minnesota Attorney General's Office, St. Paul, MN, for Defendant Dennis Olson, Jr.

---

Minnesota's Private Career School Act requires private vocational schools to be licensed. To obtain licensure from the Minnesota Office of Higher Education, these schools must pay fees, maintain student records, submit to inspections, provide financial information, and much more. The Act exempts some schools from the licensure requirement based on the subjects they teach. Schools that teach modeling and acting, for example, are categorically exempt. Schools that teach students the vocational skills necessary to become professional bicycle mechanics are not.

In this case brought against the Commissioner of the Office of Higher Education, Plaintiffs Leda Mox and her equine-massage school, Armstrong Equine Massage Therapy, LLC, claim the Act's requirements impose content-based restrictions on their First Amendment freedom-of-speech rights. Ms. Mox and Armstrong seek declaratory and injunctive relief forbidding the Office of Higher Education from enforcing the Act against them.

The parties have filed competing summary-judgment motions. Ms. Mox and Armstrong's motion will be granted, and the Commissioner's motion will be denied. Ms. Mox and Armstrong had Article III standing to bring this case when they filed it. Post-filing events—the Office of Higher Education's declared change-of-position regarding the Act's application to Armstrong and amendments to the Act—do not moot the case. And on the merits, the Act does not survive strict scrutiny.

I

Start with the challenged statute—the Minnesota Private Career School Act, Minn. Stat. §§ 136A.82–136A.834. When Ms. Mox and Armstrong filed this lawsuit in November 2023, the Act defined a private career school as "a person who maintains, advertises, administers, solicits for, or conducts any program at less than an associate degree level." Minn. Stat. § 136A.821, subdiv. 5 (2023). The Act did not apply to schools that granted degrees at an associate level or higher. *See id.* (providing that the Act does not apply to any school "registered as a private institution under sections 136A.61 to 136A.71"); *see also* Minn. Stat. § 136A.62, subdiv. 4 (2023) (applying the Minnesota Private and Out-of-State Public Postsecondary Education Act to schools that grant

2

"associate, bachelor, baccalaureate, masters, or doctorate" degrees).  And the Act did not apply to private career schools that fit one or more of eighteen enumerated exemptions. Minn. Stat. § 136A.833, subdiv. 2 (2023).  Some exemptions established a coverage threshold: courses consisting of fewer than sixteen hours of instruction, or those where tuition, fees, and other charges combined did not exceed $100 were exempted from the Act's requirements.  Minn. Stat. § 136A.833, subdivs. 2(15), (18) (2023).  Other exemptions applied to course subjects.  For example, the Act exempted schools that taught "purely avocational, recreational, or remedial subjects."  Minn. Stat. § 136A.833, subdiv. 2(10) (2023).[1]  Courses in modeling, acting, and "personal development" were exempt, Minn. Stat. § 136A.833, subdiv. 2(16) (2023), as were "courses taught to students in an apprenticeship . . . and taught or required by a trade union."  Minn. Stat. § 136A.833, subdiv. 2(6) (2023).  "[C]lasses . . . intended to prepare students to sit for undergraduate, graduate, postgraduate, or occupational licensing, certification, or entrance examinations" were exempt too.  Minn. Stat. § 136A.833, subdiv. 2(14) (2023).  Religious schools were broadly exempt.  Minn. Stat. § 136A.834, subdiv. 1 (2023).  Private career schools that believed they were exempt were not allowed to operate on their honor; the Act required them to "apply to the office to establish that the school meets the requirements of an exemption."  Minn. Stat. § 136A.833, subdiv. 1 (2023).  Any exemption granted by the

---

[1]    By rule, "[a] school that promises, makes reference to, or advertises preparation for gainful employment upon completion of one of its programs shall not be considered as engaged exclusively in the teaching of purely avocational or recreational subjects under Minnesota Statutes, section 136A.833."  Minn. R. 4880.2400.  This rule became effective in 2015 and remains on the books today.  *See id.* (describing history and indicating publication date).

Office expired after two years, meaning the exempted school would have to re-apply biennially. *Id.*

On June 9, 2025, the Minnesota Legislature passed amendments to the Act.[2] The amendments were signed into law on June 14, 2025, and took effect July 1, 2025. *See* 2025 Minn. Laws 1st Spec. Sess., ch. 5; Minn. Stat. § 645.02 (2024).[3] Relevant here, "private career school" was redefined as "a person who maintains a physical presence for any program at less than an associate degree level," and the amendments added twelve enumerated categories of schools or programs to which the "private career school" definition did not extend. 2025 Minn. Laws 1st Spec. Sess., ch. 5, art. 2, § 34. These included, for example, trade-union apprenticeship programs, "review classes . . . intended to prepare students to sit for undergraduate, graduate, postgraduate, or occupational licensing, certification, or entrance examinations," certain "programs in the fine arts," and continuing-education courses intended to fulfill a profession's licensure or certification requirements. 2025 Minn. Laws 1st Spec. Sess., ch. 5, art. 2, § 34. In other words, these amendments relocated several of the pre-2025 Act's "exemptions" into the revised Act's "private career school" definition as exclusions. The amendments also changed the number

---

[2]     The legislature also amended the Act in 2024. *See* 2024 Minn. Laws, ch. 124. The 2024 amendments are not relevant to the parties' summary-judgment motions, so it is not necessary to address them.

[3]     Under Minnesota Statutes section 645.02, "[a]n appropriation act or an act having appropriation items enacted finally at any session of the legislature takes effect at the beginning of the first day of July next following its final enactment, unless a different date is specified in the act." The act that amended the Private Career Schools Act included appropriation items and specified no different effective date. *See* 2025 Minn. Laws 1st Spec. Sess., ch. 5.

and content of the Act's exemptions in section 136A.833.  The remaining exemptions were condensed to three numbered paragraphs and rewritten as follows:

> (1) private career schools engaged exclusively in the teaching of avocational programs that are engaged primarily for personal development, recreation, or remedial education, and are not generally intended for vocational or career advancement, including adult basic education, exercise or fitness teacher programs, modeling, or acting, as determined by the office;
>
> (2) classes, courses, or programs providing 40 or fewer clock hours of instruction; and
>
> (3) private career schools providing training, instructional programs, or courses where tuition, fees, and any other charges for a student to participate do not exceed $500.

2025 Minn. Laws 1st Spec. Sess., ch. 5, art. 2, § 50.

The requirements imposed on a private career school governed by the Act were not amended, meaning they remain the same today as they did when the case was filed. Schools covered by the Act are required to obtain a license from the Office of Higher Education.  Minn. Stat. § 136A.822, subdiv. 1 (2025).  To obtain licensure, a private career school must apply "on forms prepared and furnished by the [Office of Higher Education]" and provide required information, including:

> (1) the title or name of the private career school, ownership and controlling officers, members, managing employees, and director;
>
> (2) the specific programs which will be offered and the specific purposes of the instruction;
>
> (3) the place or places where the instruction will be given;
>
> (4) a listing of the equipment available for instruction in each program;

(5) the maximum enrollment to be accommodated with equipment available in each specified program;

(6) the qualifications of instructors and supervisors in each specified program;

(7) financial documents related to the entity's and higher-level entity's most recently completed fiscal year:

(i) annual gross revenues from all sources;

(ii) financial statements subjected to a review-level engagement or, if requested by the office, audited financial statements;

(iii) a school's most recent compliance audit, if applicable; and

(iv) a current balance sheet, income statement, and adequate supporting documentation, prepared and certified by an independent public accountant or CPA;

(8) copies of all media advertising and promotional literature and brochures or electronic display currently used or reasonably expected to be used by the private career school;

(9) copies of all Minnesota enrollment agreement forms and contract forms and all enrollment agreement forms and contract forms used in Minnesota; and

(10) gross income earned in the preceding year from student tuition, fees, and other required institutional charges.

Minn. Stat. § 136A.822, subdiv. 4 (2025).  In addition to these items, the statute gives the Office of Higher Education power to require applicants to submit other information it "may require."  Minn. Stat. § 136A.822, subdiv. 4 (2025).  The application fee "for a private career school that will offer no more than one program during its first year of operation" is $3,730.  Minn. Stat. § 136A.824, subdiv. 1(1) (2025).  Schools subject to the Act are required, for example, to file a corporate surety bond of at least $10,000, Minn. Stat.

§ 136A.822, subdiv. 6(a)–(b), (b)(1) (2025), submit to inspection, Minn. Stat. § 136A.829, subdiv. 1(4) (2025), and retain student records for at least fifty years, Minn. Stat. § 136A.822, subdiv. 12(a) (2025).  Schools not in compliance with the Act may be fined and enjoined from operating.  Minn. Stat. §§ 136A.831, 136A.832 (2025).

II[4]

Through Armstrong, Ms. Mox has taught equine-massage "classes to about 30–40 students each year."  ECF No. 48-1 at 3 ¶ 5.[5]  Armstrong offers four classes.  *Id.* at 3 ¶ 6.  "The first two are the 'Introduction' and 'Horse Owners' classes which are one-day classes designed to teach animal owners how to care for their pets."  *Id.*  Students in these two classes include "recreational riders and horse trainers, [and] sometimes even veterinarians."  *Id.*  Students who take just these classes receive no certification.  *See id.* at 3–4 ¶¶ 6, 7.  The other two classes—the "Foundations" (or "AEM-1") class and the "Master" (or "AEM-2") class—offer certifications.  *Id.* at 4 ¶¶ 7, 10.[6]  The Foundations class is "a continuation of the first two courses, plus an additional two days covering topics like safety, advanced equine massage, equine anatomy, and other therapy techniques like acupuncture, stretching, and myofascial release."  *Id.* at 4 ¶ 7.  The Foundations class is offered once per month to about four students per class.  *Id.*  The Master class is offered quarterly to students who have completed the Foundations class.  *Id.* at 4 ¶ 8; *id.* at 243.

---

[4]    Unless noted otherwise, the facts are undisputed.  Fed. R. Civ. P. 56(c).

[5]    All page citations are to pagination assigned by CM/ECF appearing in a document's upper right corner, not to a document's original pagination.

[6]    "AEM" is understood to be an acronym for "Advanced Equine Massage."

The Master class "is more intensive and includes a brief discussion about starting an equine massage business and keeping accurate records of the animals." *Id.* The Master class includes 32 classroom instructional hours. ECF No. 39-1 at 11–12. To complete the Master class, students "must pass a written exam and complete ten 'case studies' on different horses," which take "in excess of 10 hours" to complete "in the months after the in-person coursework" is finished. ECF No. 48-1 at 4 ¶ 9. In Ms. Mox's view, "[s]tudents who satisfactorily complete the [AEM-2/Master class] are . . . qualified to massage horses professionally." *Id.* at 4 ¶ 11. "[A] handful of students have completed the . . . Master Class, and less than ten percent of [the] students go on to practice or teach equine massage professionally." *Id.* at 5 ¶ 13.[7] Ms. Mox "hope[s] that, over time and with more marketing effort, the [Master Class] will become more popular." *Id.* at 5 ¶ 14.

On March 1, 2023, Minnesota Office of Higher Education Institutional Monitoring Specialist Kate McCartan learned of Armstrong's equine-massage classes after the Minnesota Office's Wisconsin counterpart—the Wisconsin Department of Safety and Professional Services—inquired about whether Armstrong was licensed to provide the classes in Minnesota. *See* ECF No. 39-1 at 82–84. An official with the Wisconsin Department emailed Ms. McCarten and described Armstrong as "a Minnesota animal

---

[7]    The declaration in which Ms. Mox testified that "a handful of students have completed the Master Class," ECF No. 48-1 at 5 ¶ 13, is dated June 12, 2025, *id.* at 7. In earlier discovery responses dated November 7, 2024, Ms. Mox verified that "no student ha[d] completed the AEM-2 Master Class in the relevant period, and only one student ha[d] nearly completed her case studies." ECF No. 39-1 at 35, 38. For the summary-judgment motions' purposes, the more recent representation—*i.e.*, that "a handful of students" completed the AEM-2 Master Class—will be accepted as true. There is no reason to think these statements are contradictory; they were just made at different times.

massage school that has been offering noncompliant training in Wisconsin." ECF No. 48-1 at 38.

A little over an hour later, two officials with the Minnesota Office of Higher Education—Institutional Registration & Licensing Manager Betsy Talbot and Licensing Specialist Brian Geraghty—determined that Armstrong was required to be licensed. *Id.* at 55 ("This is a new one. And yes, it needs to be licensed."); *id.* at 58 ("Never heard of them but you are right on the money they [sic] offer one or more certifications!"). In her deposition, Ms. McCarten testified that she reviewed Armstrong's website and determined that Armstrong did not appear to qualify for an exemption under the Act, meaning it would have required a license to operate. *Id.* at 80–81. Ms. McCarten also testified that if a school markets its courses "as an opportunity to expand [students'] employment opportunities, then it falls under the Private Career Schools Act," and that when she reviewed Armstrong's website, Ms. Mox was "marketing her certificate as a way to . . . expand career opportunities." *Id.* at 83.

That same day (March 1, 2023), Ms. McCartan sent a letter to Armstrong. *Id.* at 33. In the letter, Ms. McCarten explained her Office had learned that Armstrong "may be offering or hosting postsecondary education in . . . Minnesota" and that Armstrong "may fall under the purview of" the Private Career Schools Act. *Id.* The letter notified Armstrong that schools subject to the Act "that have not completed the appropriate licensure process must not advertise or operate in Minnesota" and that schools "operating in Minnesota without required licensure are subject to an injunction and/or other penalties." *Id.* To enable the Office to determine whether Armstrong was "in compliance with

Minnesota law," the letter insisted that Armstrong notify the Office by letter or email "of the nature of [its] activities by March 16, 2023." *Id.*

After receiving the letter, Ms. Mox spoke with Ms. McCartan by telephone on March 3. *See* ECF No. 39-1 at 19, 95–99. Ms. McCartan mentioned the possibility that Armstrong might fall into one of the Private Career Schools Act's exemptions and suggested Ms. Mox review the statute. *Id.* at 21. After reviewing the Act, however, Ms. Mox concluded Armstrong did not fit within any of its exemptions. *Id.* After the call, Ms. McCartan emailed Ms. Mox with additional information regarding the license-application process and requirements and referred her to Licensing Specialist Geraghty, explaining he "manage[d] the licensure applications and work[ed] with new providers to help them through the application process." *See id.* at 96. Ms. Mox spoke with Mr. Geraghty by telephone. *Id.* at 21. After Ms. Mox explained Armstrong's programs, Mr. Geraghty told Ms. Mox that Armstrong was required to submit a license application. *Id.* at 22. Ms. Mox began the application process but realized that some of the licensure requirements were "not applicable to [Armstrong's] program" and that other requirements—including the surety-bond, facility-access rules, inspections, and the then-$2,500 application fee—were going to be "very cumbersome." *Id.* at 23–24. These concerns prompted Ms. Mox and Armstrong to bring this case. *See id.*

In their single-count Complaint, Ms. Mox and Armstrong claim "[t]he Act's general regulation of speech and messaging, subjecting some schools to licensing requirements while exempting others, is an unconstitutional content-based restriction on speech and violates the First Amendment." Compl. [ECF No. 1] ¶ 112. They claim the Office of

Higher Education cannot show that the Act "directly advances a substantial, important, or compelling government interest." *Id.* ¶ 114. For relief, Ms. Mox and Armstrong seek a declaration that the Act's "application . . . to persons . . . desiring to teach equine massage for a fee is unconstitutional in violation of the First Amendment." *Id.* at 24 (following the "REQUEST FOR RELIEF"). They also seek injunctive and declaratory relief that would forbid the Office from applying the Act to Ms. Mox and Armstrong and an award of attorneys' fees and costs incurred in bringing and prosecuting this action. *See id.* at 24–25.

### III

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. When, as here, there are cross-motions for summary judgment, each side receives the benefit of this rule in response to the other side's motion. *See, e.g., Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012). In other words, when considering Plaintiffs' motion, the record must be viewed in the light most favorable to the Commissioner, and when considering the Commissioner's motion, the record must be viewed in the light most favorable to Plaintiffs. *See id.*

Together, the parties have raised three issues requiring adjudication: (A) whether Ms. Mox and Armstrong possessed Article III standing to bring the case; (B) whether the case is moot; and (C) whether the Act is unconstitutional as applied to Ms. Mox and Armstrong. These issues will be addressed in that order.

A

The Commissioner argues that Ms. Mox and Armstrong suffered no Article III injury, meaning they lacked constitutional standing to bring this case. The general rules governing Article III standing are settled. The United States Constitution limits the subject-matter jurisdiction of federal courts to ongoing cases and controversies. *See* U.S. Const. art. III, § 2, cl. 1. "Therefore, the plaintiff's standing to sue 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "[S]tanding is based on the facts as they existed at the time the lawsuit was filed." *Steger*, 228 F.3d at 893. Standing "must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation modified).

"To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury will likely be redressed by a favorable decision." *Steger*, 228 F.3d at 892 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required

at the successive stages of the litigation." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504 U.S. at 561). Therefore, in this summary-judgment context, the familiar summary-judgment standards apply, just as they would if the issue concerned the case's merits. The Commissioner agrees—or at least does not dispute— that, if Ms. Mox and Armstrong suffered an Article III-worthy injury, they have shown causality and redressability. The standing question is all about injury.

Several rules apply to answer whether Ms. Mox and Armstrong suffered an Article III–worthy injury. An injury-in-fact is the "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation modified). Regarding First Amendment claims specifically, the Eighth Circuit explained:

> There are two types of injuries conferring standing for prospective First Amendment relief. *See Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016). The first occurs when a plaintiff alleges "[1] an intention to engage in a course of conduct arguably affected with a constitutional interest, but [2] proscribed by a statute, and [3] there exists a credible threat of prosecution thereunder." *Id.* (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979)). The second occurs when a plaintiff self-censors. *Id.* (citing *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011)). Self-censoring occurs when a plaintiff alleges it "would like to engage in arguably protected speech, but that [it] is chilled from doing so by the existence of the statute." *Arneson*, 638 F.3d at 627.

*Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022) (bracketed numbers added). To show a credible threat of prosecution for Article III purposes, a plaintiff need not "actually violate[]" the challenged statute or "risk prosecution." *Jones v. Jegley*, 947

13

F.3d 1100, 1104 (8th Cir. 2020). "[W]hen a course of action is within the plain text of a statute, a 'credible threat of prosecution' exists." *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 778 (8th Cir. 2019). "Total lack of enforcement of a statute" may defeat a plaintiff's attempt to show a credible threat of prosecution, "but only in extreme cases approaching desuetude." *Arneson*, 638 F.3d at 628 (citing *St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006)); *see also Jones*, 947 F.3d at 1104 (recognizing that a plaintiff's fear of consequences and self-censorship is reasonable "as long as there is no 'evidence—via official policy or a long history of disuse—that authorities' have 'actually' refused to enforce [the] statute" (quoting *Arneson*, 638 F.3d at 628)). Self-censorship based on the chilling effect of a statute is a sufficient injury in fact so long as the plaintiff's fear of consequences is "objectively reasonable." *Arneson*, 638 F.3d at 627 (quoting *Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009)).

Here, Ms. Mox and Armstrong suffered Article III injury as a matter of law. (1) Through Armstrong, Ms. Mox "engage[d] in a course of conduct arguably affected with a constitutional interest." *Missourians for Fiscal Accountability*, 830 F.3d at 794 (quoting *Babbitt*, 442 U.S. at 298). Ms. Mox taught equine massage, and as the Ninth Circuit recently explained, "the First Amendment's protections for speech encompass situations where a teacher's 'speech to [students] imparts a "specific skill" or communicates advice derived from "specialized knowledge."'" *Hubbard v. City of San Diego*, 139 F.4th 843, 850 (9th Cir. 2025) (quoting *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020) (alteration in original) (in turn quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 27 (2010))). Record evidence establishes beyond any reasonable

dispute that equine massage is a specific skill and that, in teaching the subject, Ms. Mox imparted specialized knowledge. As Ms. Mox explained (and the Commissioner did not rebut), "[e]quine massage is widely recognized as a form of animal therapy and has been practiced for decades." ECF No. 48-1 at 3 ¶ 3. The practice "helps horses, like humans, by alleviating muscle pain, improving mobility, and helping to recover from athletic events." *Id.* And Ms. Mox has extensive training and experience that enables her to teach the subject, including a "bachelor's degree in equine science from the University of Minnesota," a certification in equine massage, and a certification in the practice of applying kinesiology tape. *Id.* at 2–3 ¶ 2. (2) In the Office's pre-litigation view, the Private Career Schools Act forbade Armstrong and Ms. Mox from teaching without first applying for a license or exemption. *See* Minn. Stat. §§ 136A.822, subdivs. 1, 4; 136A.833, subdiv. 1 (2023). Never mind that two officials in the Office concluded the Act applied to Armstrong in the sense that Armstrong required a license to operate. ECF No. 48-1 at 55, 58. The Office separately concluded that the Act applied to Armstrong in the sense it required Ms. Mox and Armstrong to file an application no matter what. ECF No. 39-1 at 22. The application process was time-consuming and expensive; the application was 30 pages long, *see* ECF No. 39-1 at 52–81, required extensive information, *see id.*; *see also* Minn. Stat. § 136A.822, subdivs. 4, 5 (2023), and required the payment of a minimum $2,500 fee, Minn. Stat. § 136A.824, subdiv. 1(1) (2023). And the risk of business-and-speech-halting injunction and fines hung over Ms. Mox and Armstrong had they violated the Act, including by failing to submit a required application. Minn. Stat. §§ 136A.831, 136A.832 (2023). (3) Finally, the Commissioner has not suggested the Act fell into a state of disuse.

Ms. McCarten's March 1 letter, ECF No. 48-1 at 33, and Mr. Geraghty's insistence that Armstrong comply with the Act's application requirements, ECF No. 39-1 at 22, establish just the opposite.

The Commissioner's position that Ms. Mox and Armstrong suffered no Article III injury is not convincing. The Commissioner argues that Ms. Mox and Armstrong suffered no injury because the Office of Higher Education "never took any enforcement action against" Ms. Mox or Armstrong. ECF No. 51 at 4. He describes Ms. Mox and Armstrong's fear of future enforcement as "subjective, unfounded, and unreasonable." *Id.* at 5. But an enforcement action is not a prerequisite to a First Amendment plaintiff's standing. What's needed is a "credible threat of prosecution" under the challenged law. *Missourians for Fiscal Accountability*, 830 F.3d at 794 (quoting *Babbitt*, 442 U.S. at 298). We have at least that here. It is true that the Office did not refer Ms. Mox or Armstrong to the Attorney General, seek to enjoin them from operating, or seek the imposition of fines. But those are not the only injury-inflicting actions the Office could have taken. The Office's insistence that Ms. Mox and Armstrong complete the application process and pay the fee are enough. They show the Act applied to Armstrong. (Indeed, it is difficult to understand how requiring Ms. Mox and Armstrong to follow the Act in these respects was not "enforcement action.") The Commissioner also argues that Ms. Mox and Armstrong suffered no injury because they have continued to offer equine massage courses as this case was litigated. The Commissioner cites no authority for the proposition that a First Amendment plaintiff who continues to engage in protected activity at the risk of violating an assertedly unconstitutional law lacks Article III injury. The proposition would be difficult to accept.

If a First Amendment plaintiff need not "actually violate[]" the challenged statute or "risk prosecution" to suffer injury, *Jegley*, 947 F.3d at 1104, it stands to reason that a plaintiff who does these things under the cloud of threatened enforcement may still suffer Article III–worthy injury. To put it differently, self-censorship is one way a First Amendment plaintiff might show Article III injury, but it's not the only way. Finally, the Commissioner argues, albeit perfunctorily, that Ms. Mox and Armstrong lack standing now that the Act has been amended. This argument, however, raises a mootness question distinct from Article III injury. *See West Virginia v. EPA*, 597 U.S. 697, 719 (2022) ("It is the doctrine of *mootness*, not standing, that addresses whether an intervening circumstance has deprived the plaintiff of a personal stake in the outcome of the lawsuit." (citation modified)). The mootness issue will be addressed in the next section.

B

The Commissioner says Plaintiffs' claims are moot, and he seeks summary judgment on this ground. "An actual [case or] controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC*, 568 U.S. at 90–91 (citation modified). "When, during the course of litigation, the issues presented in a case 'lose their life because of the passage of time or a change in circumstances . . . and a federal court can no longer grant effective relief,' the case is considered moot." *Haden v. Pelofsky*, 212 F.3d 466, 469 (8th Cir. 2000) (quoting *Beck ex rel. Beck v. Mo. State High Sch. Activities Ass'n*, 18 F.3d 604, 605 (8th Cir. 1994)). If an action is moot because it no longer satisfies the case-or-controversy requirement, a federal court has "no discretion and

must dismiss the action for lack of jurisdiction." *Ali v. Cangemi*, 419 F.3d 722, 724 (8th Cir. 2005) (citing *Powell v. McCormack*, 395 U.S. 486, 496 n.7 (1969)).

The Commissioner's mootness arguments fall in two categories.  (1) According to the Commissioner, the Office of Higher Education formally determined in December 2024 that the Private Career Schools Act's then-effective version did not apply to Armstrong in the sense that it did not require Armstrong to be licensed under the Act.  (2) Alternatively, the Commissioner argues that mid-litigation revisions to the Act left it inapplicable to Armstrong beginning on the revisions' July 1, 2025 effective date.  Consider these contentions in that order.

1

According to the Commissioner, discovery established that Armstrong never was subject to the Act's licensing requirement because Armstrong all along met the pre-2025-amendment version of the Act's exemption covering "private career schools engaged exclusively in the teaching of purely avocational . . . subjects."  Minn. Stat. § 136A.833, subdiv. 2(10) (2023).  Understanding this contention requires some additional factual background.  During discovery, Ms. Mox and Armstrong served interrogatory responses regarding the AEM-2/Master class's history and content.  They explained that, as of November 2024, no student had completed the course, though "one student ha[d] nearly completed her case studies."  ECF No. 39-1 at 35.  They explained that the course's "Marketing/Business" elements were covered during one hour of the course's four days, usually over lunch, and that the specific covered topics included students' course goals, their plans for completing required case studies, time management, use of social media,

18

case-study drafting, and any questions students may have regarding Armstrong. *Id.* at 36.

Ms. Mox elaborated on this subject during her deposition. In response to a question asking

what was covered during the Marketing/Business unit, Ms. Mox testified that students

> ask usually how much I charge, what the going rate is for
> massage. The ones that do . . . have a business they're trying
> to establish, they might ask for advice on what to do. I've been
> asked what they can use as a business tax write-off, which then
> I refer them to their CPA or accountant because I don't have a
> business degree.

*Id.* at 16. Ms. Mox and Armstrong also served interrogatory responses describing the

specific topics covered during the course's "Client Records" unit. *Id.* at 36–37.

The Office of Higher Education's General Counsel and Director of Compliance,

Andrew Wold, testified in his deposition that, based on this information, he concluded

Armstrong's AEM-2/Master class was "avocational," meaning Armstrong did not require

licensure under the Act. *See* ECF No. 48-1 at 93–95; ECF No. 40 ¶ 1; *see* ECF No. 48-1

at 81. In an unsigned letter to Ms. Mox dated December 16, 2024, the Office's Institutional

Registration and Licensing Unit wrote:

> Thank you for providing the information and materials relating
> to Armstrong Equine Massage Therapy, LLC. Based on our
> review of the information and materials submitted to this
> office, it appears that Armstrong Equine Massage Therapy,
> LLC. [sic is exempt from licensure pursuant to the Private
> Career School Act, specifically pursuant to the following
> section, Minn. Statutes 136A.833 Subd 2 (9); [sic]
>
> > *(9) private career schools engaged exclusively in the
> > teaching of purely avocational, recreational, or
> > remedial subjects that are not advertised or maintained
> > for vocational or career advancement, including adult
> > basic education, as determined by the office except
> > private career schools required to obtain a private*

19

> *career school license due to the use of "college" or*
> *"university" in their names;*
>
> *** This exemption (9) is incompatible with being listed*
> *on Minnesota's ETPL or eligible for WIOA funding. ***

ECF No. 39-1 at 100.

The Commissioner's argument that this mid-litigation letter moots Ms. Mox and Armstrong's claims implicates the voluntary-cessation doctrine—as in, the Commissioner voluntarily ceased taking the view that the Private Career Schools Act applied to Armstrong. A litigant's "voluntary cessation of a challenged practice does not necessarily moot a case." *Hillesheim v. Holiday Stationstores, Inc.*, 903 F.3d 786, 791 (8th Cir. 2018). If it did, "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already, LLC*, 568 U.S. at 91. Even when cessation is voluntary, however, "[a] case might become moot if subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Prowse v. Payne*, 984 F.3d 700, 702 (8th Cir. 2021) (alterations in original) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). "The burden of showing that the challenged conduct is unlikely to recur rests on the party asserting mootness." *Strutton v. Meade*, 668 F.3d 549, 556 (8th Cir. 2012). This burden is "formidable." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Friends of the Earth*, 528 U.S. at 190). In the past, our Eighth Circuit Court of Appeals has said that this ordinarily "heavy burden" is "slightly less onerous when it is the government that has voluntarily ceased the challenged conduct." *Prowse*, 984 F.3d at 703 (collecting cases).

In *Fikre*, however—a case involving a governmental defendant—the Supreme Court made clear that the "formidable burden" to show mootness "holds for governmental defendants no less than for private ones." 601 U.S. at 241.

Whether formidable or something slightly less demanding, the Commissioner has not carried his burden. The Office's December 2024 letter is not conclusive regarding the Commissioner's enforcement position as to Armstrong. It says only that, in the Office's view, "it appears" Armstrong is exempt. ECF No. 39-1 at 100. Ordinarily, saying something "appears" to fit a description is a conditional, tentative observation. A non-final determination of that sort cannot show it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Prowse*, 984 F.3d at 702. Other courts have reached comparable conclusions, finding that conditional or inconclusive changes in circumstances do not meet the voluntary-cessation doctrine. *See, e.g.*, *True the Vote, Inc. v. IRS*, 831 F.3d 551, 563 (D.C. Cir. 2016) ("A violation of right that is 'suspended until further notice' has not become the subject of voluntary cessation, with no reasonable expectation of resumption, so as to moot litigation against the violation of rights. Rather, it has at most advised the victim of the violation—'you're alright for now, but there may be another shoe falling.'"); *PerfectVision Mfg., Inc. v. PPC Broadband, Inc.*, 951 F. Supp. 2d 1083, 1089 (E.D. Ark. 2013) (finding that a covenant's conditional character did not make it absolutely clear that the defendant could reasonably be expected not to resume its enforcement efforts against the plaintiff); *Brooks v. Gant*, No. CIV. 12-5003-KES, 2012 WL 4748071, at *4 (D.S.D. Oct. 4, 2012) (concluding that an agreement's "conditional or terminative nature" meant it did not moot the case).

If the December 2024 letter might reasonably be understood to express a conclusive determination, several facts would give reason to doubt whether the determination is genuine and enduring, but the Commissioner has not addressed them. The decision to send the letter was not made in the Office's ordinary course. Within the Office, Ms. McCartan was responsible for determining whether a private career school fell within one or more of the Act's exemptions. ECF No. 48-1 at 63. She concluded Armstrong was not "engaged exclusively in the teaching of purely avocational . . . subjects," Minn. Stat. § 136A.833, subdiv. 2(10) (2023), because Armstrong marketed its certification as a way for its students to expand their career opportunities, ECF No. 48-1 at 81, 83. After this case was brought and litigated for several months, however, Mr. Wold determined that Armstrong qualified under the "avocational" exemption without Ms. McCartan's input. *Id.* at 81, 93–95. In her deposition, Ms. McCarten testified this was not a normal process, that she was not aware of another case in which Mr. Wold determined an exemption's applicability, and that Mr. Wold did not tell her why he determined Armstrong might qualify under the avocational exemption. *Id.* at 82.

And the reasons Mr. Wold identified as support for his decision are at odds with the avocational exemption's text and an accompanying rule. In his deposition, Mr. Wold testified that his decision was based on Ms. Mox and Armstrong's fall 2024 discovery responses. *Id.* at 94. According to Mr. Wold, the discovery responses showed that "*most people* who take these courses are doing so for their own personal benefit." *Id.* (emphasis added). He acknowledged Armstrong had represented that its courses could enhance students' career prospects, but testified Armstrong made those statements infrequently. *Id.*

22

at 95.  The problem is that, in late 2024, the avocational exemption's application did not depend on whether "most people" took a school's course for personal benefit or whether a school's career-enhancement promotions were infrequent.  The Act exempted schools "engaged *exclusively* in the teaching of *purely* avocational . . . subjects that are *not advertised or maintained* for vocational or career advancement."  Minn. Stat. 136A.833, subdiv. 2(9) (2024) (emphasis added).  And a rule covering the exemption made clear that "[a] school that promises, makes reference to, or advertises preparation for gainful employment upon completion of one of its programs shall not be considered as engaged exclusively in the teaching of purely avocational or recreational subjects under" the avocational exemption "and shall be subject to licensure."  Minn. R. 4880.2400 (2024).  In other words, some career-enhancement-directed teaching or advertising was enough to subject a private career school to licensure, and there is no dispute Armstrong did these things.  The Commissioner has not explained how to square Mr. Wold's given justifications with the exemption's statutory text or its associated rule.

Evidence that a defendant's change-of-position occurred outside the ordinary course and was based on a legally suspect rationale arguably shows litigation-avoidance maneuvering for its own sake, not an enduring change-of-position.  The Commissioner has not carried his burden to show that the ostensible change-of-position communicated in the Office's December 2024 letter moots this case.

2

The Commissioner's argument that the 2025 amendments to the Private Career Schools Act moot the case implicates an additional set of rules.  "When a law has been

amended or repealed, actions seeking declaratory or injunctive relief for earlier versions are generally moot." *Teague v. Cooper*, 720 F.3d 973, 976 (8th Cir. 2013) (quotation omitted); *accord Libertarian Party of Ark. v. Martin*, 876 F.3d 948, 951 (8th Cir. 2017). But "where a new statute 'is sufficiently similar to the repealed statute that it is permissible to say that the challenged conduct continues' the controversy is not mooted by the change, and a federal court continues to have jurisdiction." *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1548 (8th Cir. 1996) (citation modified) (quoting *Ne. Fla. Ch. of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 n.3 (1993)). Stated another way, "[i]f the new statute disadvantages the complainants in the same fundamental way the repealed statute did, the amendment does not divest the court of the power to decide the case." *Id.* (citing *City of Jacksonville*, 508 U.S. at 662); *see Rembert v. Sheahan*, 62 F.3d 937, 941 (7th Cir. 1995) ("[W]hen an intervening amendment provides no assurance that the complained-of conduct will cease, the case is not moot." (citing *City of Jacksonville*, 508 U.S. at 662)). As in other mootness contexts, the governmental defendant bears the burden to show that a law's amendment or repeal demonstrates the challenged conduct cannot reasonably be expected to recur. *Arkansas Med. Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 529 (8th Cir. 1993) (requiring the governmental entity to show that its withdrawal of a challenged rule reducing health care reimbursement rates rendered the case moot).

For this argument, the Commissioner relies on amendments to two of the Act's exemptions. The first amendment raised the ceiling on the Act's "clock hours of instruction" exemption from "16 or fewer" hours to "40 or fewer." *Contrast* Minn. Stat. § 136A.833, subdiv. 2(15) (2023), *with* 2025 Minn. Laws 1st Spec. Sess., ch. 5, art. 2, § 50.

24

The Commissioner argues that no Armstrong course provides more than 40 hours of instruction.  The second amendment revised the avocational exemption to cover "schools engaged exclusively in the teaching of avocational programs that are engaged primarily for personal development, recreation, or remedial education, and are not generally intended for vocational or career advancement, including adult basic education, exercise or fitness teacher programs, modeling, or acting, as determined by the office."  Minn. Stat. § 136A.833, subdiv. 2(1) (2025).  In the Commissioner's view, Armstrong qualifies for this amended exemption even if it did not qualify for the exemption's pre-amendment version because Armstrong's courses "are clearly *primarily* avocational."  ECF No. 55 at 3. Framed in the mootness context, the question is whether the Commissioner has shown that Armstrong so clearly qualifies for either exemption that the challenged conduct—that is, the Office applying the Act to Armstrong—cannot reasonably be expected to recur. I conclude he has not.

The Commissioner has not shown that the amendment to the clock-hours exemption moots the case.  The statute defines "clock hour" as "a period of time consisting of a 50- to 60-minute class, lecture, or recitation in a 60-minute period; a 50- to 60-minute faculty-supervised laboratory, shop training, or internship in a 60-minute period; or 60 minutes of preparation in a correspondence course."  Minn. Stat. § 136A.821, subdiv. 18 (2025). Armstrong's AEM-2/Master class includes 32 in-person instructional hours.  ECF No. 39-1 at 11–12.  To complete the class, however, students must also "complete ten 'case studies' on different horses," which take "in excess of 10 hours" to complete "in the months after the in-person coursework" is finished.  ECF No. 48-1 at 4 ¶ 9.  The "clock hour"

definition does not answer whether the hours a student spends completing a course-required practicum or similar exercise count. It seems at least plausible those hours might count as "class" or "internship" time. Whatever the best interpretation may be, the Commissioner has not disavowed an interpretation that would count the required case-study hours for the exemption's purposes. All we have is lawyer argument.[8]

If lawyer argument might count as evidence of disavowal, there is another reason why the clock-hours exemption's applicability to Armstrong would not moot the case. In a relevant sense, this case is a lot like *Fikre*. There, the government placed the plaintiff on the "No Fly List." 601 U.S. at 237. An official with responsibility for the No Fly List filed a declaration in which he testified that the plaintiff "will not be placed on the No Fly List in the future based on the currently available information." *Id.* at 239–40. The Court explained that this representation might show that the plaintiff's "past actions are not enough to warrant his relisting," but the representation said nothing about "whether the

---

[8]    It does not help the Commissioner that the Office once expressed the view that a student's "project" hours are not excluded from determining a program's clock hours. ECF No. 52-1 at 10. The Commissioner argues that the email thread in which this statement appeared concerned "only . . . distance or correspondence courses." ECF No. 55 at 3. This is debatable. The statement that "project" hours (among others) count first appeared in an email from Ms. McCartan, and this email does not reference or limit that understanding of the clock-hours exemption to distance or correspondence courses. *See* ECF No. 52-1 at 10. It is true that, in a subsequent message, Ms. McCarten explained that her supervisor's view was that, for distance and correspondence education, "academic engagement would include, but not be limited to, submitting an academic assignment; taking an exam, an interactive tutorial, or computer-assisted instruction; attending a study group that was assigned by the institution; contributing to an academic online discussion; and initiating contact with a faculty member to ask a question about the academic subject studied in the course." *Id.* at 9. That a supervisor took the position that these activities count in a correspondence-course setting does not answer whether some of them might also count in an in-person setting.

government might relist him if he does the same or similar things in the future—say, attend a particular mosque or refuse renewed overtures to serve as an informant." *Id.* at 242. For that reason, the Court held that the declaration "[fell] short of demonstrating that [the government] cannot reasonably be expected to do again in the future what it is alleged to have done in the past." *Id.* (citing *Friends of the Earth*, 528 U.S. at 190). The facts here are comparable. The Office determined Armstrong required a license. It now argues Armstrong requires no license. As in *Fikre*, this contention says nothing about whether the Office might require Armstrong to be licensed if it does similar things in the future. And regarding the clock-hours exemption specifically, the chance that Armstrong will increase its program hours is not speculative. In her declaration, Ms. Mox testified that she is considering "offering longer courses and in combining [Armstrong's] AEM-1 and AEM-2 course[s] into a single program over two weeks." ECF No. 48-1 at 7 ¶ 28.

The same conclusion holds for the amended "avocational" exemption. Again, under this exemption's current version, a private career school is exempt if it is "engaged exclusively in the teaching of avocational programs that are engaged primarily for personal development, recreation, or remedial education, and are not generally intended for vocational or career advancement, including adult basic education, exercise or fitness teacher programs, modeling, or acting, as determined by the office." 2025 Minn. Laws 1st Spec. Sess. Ch. 5, art. 2, § 50. The Act does not define "avocational," though the 2025 amendments define "vocational" to "mean[] education or training for skills used in the labor market." 2025 Minn. Laws 1st Spec. Sess., Ch. 5, art. 2, § 35.

Whether this exemption covers Armstrong would depend on the resolution of at least four statutory-interpretation questions. The first is the meaning of "primarily" as it is used in the exemption. As the Supreme Court has explained,

> It is true that 'primary' when applied to a single subject often means first, chief, or principal. But that is not always the case. For other accepted and common meanings of 'primarily' are 'essentially' (Oxford English Dictionary) or 'fundamentally' (Webster New International). An activity or function may be 'primary' in that sense if it is substantial. If the underwriting business of a firm is substantial, the firm is engaged in the underwriting business in a primary way though by any quantitative test underwriting may not be its chief or principal activity.

*Bd. of Governors of Fed. Rsrv. Sys. v. Agnew*, 329 U.S. 441, 446 (1947). If "primarily" as used in the avocational exemption means "substantial," it seems less likely the exemption might cover Armstrong. A second question is the meaning of "not generally intended." What if, for example, a private career school intends all its courses to be available to students wishing to enhance their careers though fewer students enroll in the courses for career enhancement? Here, the Commissioner seems to argue that the number of students who enroll with career enhancement in mind matters—that is, the smaller that number, the more likely the school qualifies for the exemption. *See* ECF No. 55 at 2–3. But the "intent" to which the exemption refers is just as naturally understood to be the school's, not its students. And on that question, Armstrong advertised its courses as career-enhancing, ECF No. 48-1 at 83, and would like to continue doing so in the future, *see id.* at 7 ¶¶ 25–27. A third question is whether the specific subjects identified in the exemption—"adult basic education, exercise or fitness teacher programs, modeling, or acting"—are intended to be

28

an exhaustive list. As the Minnesota Supreme Court has acknowledged, its "precedent is split" regarding whether a statute's use of "including" means the list of items to which it refers is exhaustive or limited. *In re Welfare of H.B.*, 986 N.W.2d 158, 168–69 (Minn. 2022). A fourth question is whether the exemption's express delegation of authority to the Office to determine whether a school qualifies vests the Office with discretion to interpret and apply it. If so, that would add uncertainty to the exemption's reach.

As with the clock-hours exemption, it is at least plausible that the answers to these questions would leave Armstrong uncovered by the exemption. Though "less than ten percent of [Armstrong's] students go on to practice or teach equine massage professionally," ECF No. 48-1 at 5 ¶ 13, that does not answer the "substantiality" question or whether some or all of Armstrong's courses include content that Armstrong "intended" for that audience. Again, whatever the best interpretation may be, the Commissioner has neither answered these questions nor disavowed a decision that Armstrong does not—and could not—fall outside the avocational exemption. At most, the Commissioner has shown through lawyer argument that Armstrong is conceivably eligible for the avocational exemption. That does not carry the Commissioner's burden to show the case is moot.[9]

---

[9]     Notwithstanding the statutory amendment, the rule that a private career school must be licensed if it "promises, makes reference to, or advertises preparation for gainful employment upon completion of one of its programs" remains effective. Minn. R. 4880.2400 (2025). This seems like an oversight. After all, the rule incorporates text from the pre-2025 statutory exemption that was eliminated through the 2025 amendments—requiring a school to be "engaged exclusively in the teaching of *purely* avocational or recreational subjects" to merit the exemption. *Id.* (emphasis added). For this reason, the rule has not been considered as part of deciding whether the avocational exemption's 2025 amendment moots the case. If the rule still applied, it would be one more strong reason not to find the case moot due to the avocational exemption's 2025 amendments.

C

The parties' competing summary-judgment motions raise three issues regarding the merits of Plaintiffs' First Amendment claim: (1) Whether the Private Career Schools Act regulates conduct and burdens speech in merely incidental ways.  If the answer to this question is "yes," the parties seem to agree that Plaintiffs' First Amendment claim would fail as a matter of law.  (2) If the answer to the first question is no, then whether the Act is subject to strict or intermediate scrutiny.  (3) Whether, under the applicable review standard, the Act violates the First Amendment.  These issues will be addressed in that order.

1

The First Amendment, applicable to the states through the Fourteenth Amendment, provides, "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I.  Along with protecting "the spoken or written word, conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'"  *Redlich v. City of St. Louis*, 51 F.4th 283, 287 (8th Cir. 2022) (citation modified) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010) (recognizing that a law implicates speech where "the conduct triggering coverage under the statute consists of communicating a message").  The First Amendment does not protect non-expressive conduct.  *Redlich*, 51 F.4th at 287; *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech.").

30

Though the line between speech and conduct can be fuzzy, *Nat'l Inst. of Fam. and Life Advocates v. Becerra*, 585 U.S. 755, 769 (2018), cases establish helpful rules and examples. Whether a challenged statute "proscribes speech, conduct, or both depends on the particular activity in which an actor seeks to engage." *Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021). So, for example, when a business seeks to establish prices for the goods it sells, it engages in conduct; when that same business seeks to communicate its prices, it engages in speech. *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017). And a physician who refers a patient for diagnosis or treatment engages in conduct, *Brandt ex rel. Brandt v. Griffin*, 147 F.4th 867, 889 (2025), while physician-patient discourse is speech, *Wollschlaeger v. Governor*, 848 F.3d 1293, 1307 (11th Cir. 2017). Again, when a challenged statute's triggering activity "consists of communicating a message," the statute regulates speech. *Holder*, 561 U.S. at 28.

In *Kirchmeyer*, the Ninth Circuit held that vocational training is speech. 961 F.3d 1062. The *Kirchmeyer* plaintiffs challenged a California law—the California Private Postsecondary Education Act ("PPEA"), Cal. Educ. Code § 94800 *et seq.* (2019)—that prohibited career schools from accepting students who lacked either a high school diploma or a passing score on a prescribed examination. *Kirchmeyer*, 961 F.3d at 1065–66. Specifically, the PPEA prohibited "execut[ing] an enrollment agreement" between the school and the would-be student. *Id.* at 1066. The plaintiffs (a horseshoeing school, its owner, and a would-be student), challenged the PPEA on First Amendment grounds. at 1066–67. The defendants argued the PPEA regulated non-expressive conduct—"namely, the execution of the enrollment agreement between a private postsecondary school and a

prospective student." *Id.* at 1068. The district court agreed, determining the PPEA regulated only conduct and that any burden on speech was incidental. *Id.* at 1068–69. It dismissed the claim. *Id.* at 1069. But the Ninth Circuit, viewing the PPEA "in its entirety," found: "There can be little question that vocational training is speech protected by the First Amendment." *Id.* It explained:

> [The instructor's] "speech to students imparts a 'specific skill' or communicates advice derived from 'specialized knowledge.'" [*Holder*], 561 U.S. at 27. "Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). And, important to this case, "[a]n individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Id.* at 568 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984)).

*Id.* (citation modified). Two of the *Kirchmeyer* plaintiffs, the horseshoeing school and its owner, sought to teach specific skills and impart information to students. *Id.* The PPEA "regulate[d] what kind of educational programs different institutions [could] offer to different students," and, as such, "squarely implicate[d] the First Amendment." *Id.* at 1069. This holding seems uncontroversial. The Supreme Court has explained that "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell*, 564 U.S. at 570 (citing *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct.")); *see Hubbard*, 139 F.4th at 850 ("[T]he First Amendment protects teaching yoga.").

Applying these authorities here shows that the Private Career Schools Act regulates speech.   Through Armstrong, Ms. Mox taught equine massage, and teaching equine massage is speech.   As explained earlier in the standing section (Part III.A.), record evidence establishes beyond any reasonable dispute that equine massage is a specific skill and that, in teaching the subject, Ms. Mox imparted specialized knowledge.   As Ms. Mox explained (and the Commissioner did not rebut), "[e]quine massage is widely recognized as a form of animal therapy and has been practiced for decades."   ECF No. 48-1 at 3 ¶ 3. The practice "helps horses, like humans, by alleviating muscle pain, improving mobility, and helping to recover from athletic events."   *Id.*   And Ms. Mox has extensive training and experience that enables her to teach the subject, including a "bachelor's degree in equine science from the University of Minnesota," a certification in equine massage, and a certification in the practice of applying kinesiology tape.   *Id.* at 2–3 ¶ 2.   More on this in the next section, but the Act differentiates between speech—that is, its coverage is triggered by the content of Ms. Mox and Armstrong's speech.   Teaching "exercise or fitness teacher programs, modeling, [and] acting," for example, are exempt.   Minn. Stat. § 136A.833, subdiv. 2(1) (2025).   Equine massage as a subject is not.   The Act's coverage also is triggered by the purpose of a school's speech.   Courses intended to teach "avocational" skills are not licensed, but courses intended to advance students' careers are.   *Id.*   In the relevant sense, the Act regulates speech, not conduct.

The Commissioner argues that the Act regulates conduct and has only incidental effects on speech, but this is not persuasive.   To support this contention, the Commissioner says this case is like *Rumsfeld v. F. for Acad. and Institutional Rts.*, 547 U.S. 47 (2006).

There, the Supreme Court rejected a First Amendment challenge to a law denying federal funding to law schools (among other higher-education institutions) that prohibited the military "from gaining access to campuses, or access to students . . . on campuses, for purposes of military recruiting in a manner that is at least equal in quality and scope to the access to campuses and to students that is provided to any other employer." *Id.* at 55 (quoting 10 U.S.C. § 983(b)). The Court concluded that the law regulated conduct—that is, "what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* at 60. As the Court explained, "schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy, all the while retaining eligibility for federal funds." *Id.* This case is not like *Rumsfeld*. The Private Career Schools Act would forbid Ms. Mox and Armstrong from teaching equine massage—*i.e.*, what they may say—in the private-career-school context without complying with the Act's licensing requirements. The Act's licensing requirements may concern things Armstrong must do to obtain and maintain licensure, but as discussed, these requirements are triggered by the content and purpose of Ms. Mox and Armstrong's speech. In *Rumsfeld*, by contrast, the challenged statute's applicability was triggered by a school's receipt of federal funds, not a school's speech. The Commissioner also compares the Act to licensure requirements governing lawyers and physicians. As the Commissioner puts the argument, "the content of speech is an integral part of determining whether a license is required." ECF No. 51 at 21. This contention is difficult to understand. No doubt a state may require lawyers and doctors to be licensed and, as part of that, require members of each profession to meet prerequisites. *See Laws.*

*for Fair Reciprocal Admission v. United States*, 141 F.4th 1056, 1063–64 (9th Cir. 2025). And no doubt some of those prerequisites involve speech. A would-be lawyer, for example, must ordinarily graduate from law school as a prerequisite to licensure, and law students talk a lot. But whether the government can require or forbid speech occurring as part of the lawyer-client or physician-patient relationship implicates First Amendment freedom-of-speech rights. *See Becerra*, 585 U.S. at 766–73; *Wollschlaeger*, 848 F.3d at 1307.

2

"Content-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Content-neutral laws, in contrast, 'are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialog.'" *TikTok Inc. v. Garland*, 604 U.S. 56, 67 (2025) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994)). Under intermediate scrutiny, a content-neutral law will be sustained "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Id.* (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)).

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. To answer whether a law is content based, a court must first determine "whether a regulation of speech 'on its face' draws distinctions based on the message a speaker

35

conveys." *Id.* (quoting *Sorrell.*, 564 U.S. at 566). Facial content-based distinctions are "obvious" when a statute "define[s] regulated speech by particular subject matter," but laws that more subtly distinguish based on the "function or purpose" of regulated speech also are considered content-based. *Id.*; *see also McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (explaining a law "would be content based if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred" (citation modified)). "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

Again, *Kirchmeyer* is helpful because it applied these rules to determine whether the PPEA (the California law prohibiting certain students from enrolling in career schools) was content-based. The Ninth Circuit first examined whether the PPEA "differentiates between speech or speakers." *Kirchmeyer*, 961 F.3d at 1070 (citing *Holder*, 561 U.S. at 27–28). The court found the PPEA's many exemptions particularly relevant to this analysis. *See id.* at 1070–73. The PPEA's exemptions, the court explained, "turn[ed] on one of two things: (1) the content of what is being taught, or (2) the identity of the speaker." *Id.* at 1070. For example, some exemptions turned on a course's content, such as whether a course offered was "solely avocational or recreational," or on the speaker, such as an exemption for "educational programs sponsored by a bona fide trade, business, professional, or fraternal organization" for the organization's members. Cal. Educ. Code § 94874(a) and (b)(1) (2019). In the Ninth Circuit's view, owing to these exemptions, the

PPEA favored "particular kinds of speech" (*e.g.*, avocational) and "particular speakers" (*e.g.*, bona fide trade organizations). *Kirchmeyer*, 961 F.3d at 1071–72. The Act also exempted test preparation courses for standard examinations, flight instruction courses, nonprofit religious organizations, and more. *Id.* at 1066, 1071. Taken together, the court found, the many exemptions "demonstrate that the [PPEA] does more than merely impose an incidental burden on speech: it 'target[s] speech based on its communicative content.'" *Id.* at 1070–71 (quoting *Reed*, 576 U.S. at 163).

The Minnesota Private Career Schools Act deserves the same answer. Through its exemptions, the Act "applies to particular speech because of the topic discussed." *Reed*, 576 U.S. at 163. The Act exempts schools that "exclusively" teach one or more of four subjects: "[1] adult basic education, [2] exercise or fitness teacher programs, [3] modeling, or [4] acting." 2025 Minn. Laws 1st Spec. Sess. ch. 5, art. 2, § 50. Why the legislature might have been motivated to prefer schools that teach these topics is not obvious, but its motivations don't matter. *Reed*, 576 U.S. at 165–66. In other words, the First Amendment does not care whether there is evidence showing the legislature harbored anti-equine-massage sentiment; it cares whether the challenged law's application depends on the subjects a school teaches. These specific exemptions seem enough to show the Act is content-based. There is more. Through other exemptions, the Act distinguishes based on the "function or purpose" of a school's speech. *Id.* at 163. If a school's courses function primarily to provide students opportunities "for personal development" or to improve their "recreation[al]" skills, then the school is exempt. 2025 Minn. Laws 1st Spec. Sess., ch. 5, art. 2, § 50. If, by contrast, a school's courses function to provide "vocational and career

advancement," the school is not exempt. *Id.* And it does not help that the purpose-centered line between avocational and career-enhancing is not clear, or that the Act places responsibility with the Office to determine where the line falls with respect to any given school. Consider, for example, a school that teaches bicycle repair. If this course's content were relevant to the Office's avocational-versus-career-enhancing determination, that would transform a purpose-directed inquiry into one that is content-based.

It is true the Act's 2025 amendments reduced the number of exemptions and changed their content, but this doesn't change the First Amendment analysis. The remaining exemptions alone are enough to show the Act is content-based. If quantity mattered, the same analysis applies to exclusions listed in the Act's "private career school" definition. Logically, "excluding" courses from this definition up front seems the same thing as "exempting" them later. And some exclusions are plainly content- or purpose-based. These include, for example, exclusions for schools "engaged in training physically or mentally disabled persons," labor-union apprenticeship programs, classes intended to prepare students for "occupational licensing, certification, or entrance examinations," or "fine arts" courses. 2025 Minn. Laws 1st Spec. Sess., ch. 5, art. 2, § 34. In other words, determining whether a school that teaches any of these courses is excluded from the "private career school" definition would require the Office to consider the content

of the school's speech.  The exclusions just reinforce the conclusion that the Act is content-based, meaning it is subject to strict scrutiny.[10]

3

The Act does not withstand strict scrutiny.  The Commissioner conceded this.  He did not brief the question.  *See* ECF Nos. 38, 51, 55.  At the hearing on the parties' summary-judgment motions, he acknowledged the statute "would be doomed" under strict scrutiny.  ECF No. 63 at 22.  And he acknowledged that, if fact disputes exist, resolving those disputes would not yield answers that might satisfy strict scrutiny.  *Id.*  This concession seems enough to settle the issue.  Regardless, showing why the Act does not

---

[10]    The Commissioner did not argue the Act regulates "commercial speech" as applied to Ms. Mox or Armstrong.  This makes sense.  Commercial speech is "speech that *proposes* a commercial transaction."  *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989); *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980) (providing test for analyzing the constitutionality of laws burdening commercial speech); *Mo. Broads. Ass'n v. Schmitt*, 946 F.3d 453, 460 (8th Cir. 2020) (addressing 4-part *Central Hudson* test).  "To determine whether the speech at issue is commercial speech, a court must evaluate the 'content, form, and context' of the speech "as revealed by the whole record."  *Dryer v. Nat'l Football League*, 55 F. Supp. 3d 1181, 1189 (D. Minn. 2014) (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)).  "Three factors govern whether speech is commercial: (i) whether the communication is an advertisement, (ii) whether it refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech."  *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1120 (8th Cir. 1999) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)).  "The presence of all three factors provides 'strong support' for the conclusion that the speech in question is commercial."  *Id.* (citing *Bolger*, 463 U.S. at 67).  Here, the Act regulates schools based on the content and purposes of the courses they teach.  Though advertising may be relevant to that inquiry, a school's advertising is not what triggers the Act's application.  It would seem at least awkward—and probably incorrect— to say that Armstrong's courses "refer" to a specific product or service.  No doubt Ms. Mox and Armstrong possess economic motives for their speech in the sense that Armstrong charges tuition.  That economic motivation alone, however, "would clearly be insufficient by itself to turn the materials into commercial speech."  *Bolger*, 463 U.S. at 67.

withstand strict scrutiny (and the Commissioner's concession is justified) entails a relatively straightforward explanation.

The Act imposes significant burdens. The license application is burdensome. It requires applicants to provide information regarding many items. Minn. Stat. § 136A.822, subdiv. 4(1)–(10) (2025); Minn. R. § 4880.1700. These include, for example, "financial statements subjected to review-level engagement or, if requested by the office, audited financial statements," and "a current balance sheet, income statement, and adequate supporting documentation, prepared and certified by an independent public accountant or CPA." Minn. Stat. § 136A.822, subdiv. 4(7)(ii), (iv) (2025). The application also includes a non-refundable fee—in Armstrong's case of at least $3,730. Minn. Stat. §§ 136A.822, subdiv. 9, 136A.824, subdiv. 1 (2025). Applicant schools must file a corporate surety bond of at least $10,000. Minn. Stat. § 136A.822, subdiv. 6(a), (b) (2025). Other statutory requirements impose additional burdens. Licensed schools must produce "a catalog, brochure, or electronic display" describing sixteen required items. Minn. Stat. § 136A.822, subdiv. 10 (2025). They must maintain and file "a certified copy of the private career school's placement record, containing a list of graduates, a description of their jobs, names of their employers, and other information as the office may prescribe." Minn. Stat. § 136A.822, subdiv. 11(a) (2025). They must maintain permanent student records "50 years from the last date of a student's attendance." Minn. Stat. § 136A.822, subdiv. 12(a). (2025). They must submit to inspections. Minn. Stat. § 136A.829, subdiv. 1(4) (2025). And schools not in compliance with the Act may be fined or enjoined from operating. Minn. Stat. §§ 136A.832, 136A.829. Record evidence supports the

40

commonsense inference that these requirements are burdensome. One school owner, for example, estimated it took "approximately 80 hours" to complete the application and other paperwork required by the Act. ECF No. 48-1 at 121 ¶ 13. "Because the burdens of licensure were so severe," this school decided not to renew its license. *Id.* at 121 ¶ 16. In correspondence with the Office, the owner of another school described his organization as "a very small business" that lacked "the financial means to seek licensure." ECF No. 48-1 at 246. The owner of a third school explained that obtaining and maintaining a license was "extremely burdensome," and that the required paperwork took "between 100 and 150 hours of employee time" to complete. ECF No. 48-1 at 142 ¶ 8.

The Commissioner's stated justifications for the Act are not compelling. The precise question to be answered is whether the challenged law's content-based differentiation furthers a compelling governmental interest. *See Reed*, 576 U.S. at 171. In this respect, the Commissioner's burden is clear—he "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way"; this "requires a justification far stronger than mere speculation about serious harms." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995) (quoting *Turner Broad. Sys.*, 512 U.S. at 664). Here, the Commissioner has identified several justifications underlying the Act generally. These are: "schools failing to provide meaningful instruction, schools misleading potential students about job prospects, schools expelling students without basis or process, schools closing without the means to repay students, and school closures leaving students without records that would demonstrate their completion of a program." ECF No. 38 at 6, 19. A policy statement

preceding the Act's 2025 amendments identifies similar concerns, including "establishing policies and procedures to ensure the authenticity and legitimacy of vocational programs" and providing "assistance and protection for persons choosing vocational programs." 2025 Minn. Laws 1st Spec. Sess., ch. 5, art. 2, § 32. Whatever the truth of these consumer-oriented justifications, they do not answer the right question. The dispositive question is not whether the Act (as a whole) might further consumer-protection interests. The question is whether the Act's content-based differentiation between schools that must be licensed and schools that are excluded or exempted furthers a compelling governmental interest. *See Reed*, 576 U.S. at 171. The Commissioner's stated justifications do not address this question. He nowhere claims, for example, that schools the Act requires to be licensed are more likely to engage in these bad behaviors than schools that are excluded or exempted from licensing. The Commissioner's failure to address this question means he has not identified compelling reasons in the relevant sense.

D

The final question concerns the breadth of declaratory and injunctive relief. Ms. Mox and Armstrong claim the Act is unconstitutional facially and as applied to them. *See* ECF No. 46 at 44–45; *see also* Compl. at 24–25. The Commissioner argues that Ms. Mox and Armstrong forfeited their facial challenge by not doing enough to pursue it. ECF No. 51 at 24–25. The better answer is to enjoin the Act's application with respect to just Ms. Mox and Armstrong. "Facial challenges are disfavored," and to succeed, a plaintiff must establish "'that no set of circumstances exists under which [the statute] would be valid,' or "'that the statute lacks any plainly legitimate sweep.'" *Phelps-Roper v. City of Manchester*,

42

697 F.3d 678, 685 (8th Cir. 2012) (first citing *Wash. State Grange v. Wash State Republican Party*, 552 U.S. 442, 450 (2008), then quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).  Ms. Mox and Armstrong's submissions do not address this burden. They argue the Commissioner "has not identified any instances in which the Act could be constitutionally applied," implying incorrectly that the relevant burden fell on the Commissioner.  ECF No. 56 at 18.  They state the Act is "unconstitutional both facially and as-applied," ECF No. 46 at 44, but they do not address the governing legal framework or apply it to the record.  It would be a mistake to enjoin the Act's enforcement across the board when the party with the burden has not meaningfully addressed the facial-invalidity question.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.    The Motion for Summary Judgment of Defendant Dennis Olson, Jr., in his official capacity as Commissioner of the Minnesota Office of Higher Education [ECF No. 36] is **DENIED**.

2.    The Motion for Summary Judgment of Plaintiffs Leda Mox and Armstrong Equine Massage Therapy, LLC [ECF No. 44] is **GRANTED**.

3.    Defendant Dennis Olson, Jr., in his official capacity as Commissioner of the Minnesota Office of Higher Education, is permanently enjoined from enforcing the Minnesota Private Career School Act, Minn. Stat. §§ 136A.82–136A.834, and any related

rules and regulations, against Plaintiffs Leda Mox and Armstrong Equine Massage Therapy, LLC.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 24, 2025                    s/ Eric C. Tostrud
                                           Eric C. Tostrud
                                           United States District Court